BURROWS & PRETTYMAN v. COOK & SARGENT *et al.*

1. **Interest:** CODE OF 1851. Under the Code of 1851, no higher rate of interest than six per cent could be charged, in the absence of an agreement in writing to pay more.

2. —— PROMISSORY NOTE. A note, executed under the provisions of the Code of 1851, relating to the interest, for the principal debt and interest at more than six per cent, and assigned before maturity to a holder for value, without notice, is valid and may be collected by the holder.

3. —— When a contract to pay interest at the rate of twenty per cent was made in parol, under the provisions relating to interest in the Code of 1851, and such contract was continued and acted upon after the usury law of March 8, 1853, took effect, and a note was thereafter executed for the principal and interest which had accrued under both laws, the note was held vulnerable to the plea of usury as to the interest which accrued under the latter law, even in the hands of a *bona fide* assignee for value and before maturity.

4. **Usury:** CHANGE OF FIRM. Where bankers received a new partner into their firm, and thereupon opened a new set of books to which they transferred a balance due from a customer under a usurious contract, which balance was paid at his request by the new to the old firm, it was held, that the customer could interpose a plea of usury in an action for such balance by the new firm.

5. —— BILL OF EXCHANGE. A time bill of exchange drawn on a produce or other account, payable at a place other than the one where it is drawn, negotiated at a greater rate of discount than legal interest, is not necessarily. in the absence of any showing as to the rate of exchange between the places, usurious; but when the bill is accommodation paper merely, and is payable at the same place, and then sold, it is usurious.

6. —— GENERAL RULE. To render a contract usurious, it must be a loan, expressed or implied; there must be an agreement to repay the money loaned, or that which was taken as an equivalent thereto, and that without condition or contingency; and to pay a greater rate of interest than that allowed by law.

7. —— WHEN BILL IS USURIOUS. But a bill drawn on a distant point, for the purpose of a sale and as a devise to avoid the usury laws, will, if sold at a usurious discount, be regarded as usurious and void.

8. **Promissory note:** PAYMENT: EVIDENCE. When a customer of a bank executed his promissory note to the bank and the same was assigned before maturity, but not being paid, was protested, and the maker after-

Burrows & Prettyman v. Cook & Sargent.

ward continuing business with the bank, drew his check for the amount of the note, it was held, in an action between the maker and the payee of the note, that possession of both the note and the check was *prima facie evidence* of payment of the note.

9. Usury: PAYMENT. Where the notes were given in payment of a usurious account, after which one of the notes was paid, it was held, that the payment should be applied upon the amount legally due upon the aggregate account, and not as a payment of the usury in the note thus paid.

10. —— DRAFTS. Whether bills of exchange, discounted at a rate greater than the ruling rate of exchange between the place where drawn and the place of payment, are usurious, *quere?*

11. —— DOMESTIC BILLS. The discount of bills, payable at the place where drawn, at rates greater than legal interest, renders them usurious.

12. —— INDORSEE. The indorsee of a usurious note stands in no better position than the original payee.

13. —— JUDGMENT FOR. A court of equity will not regard an agreement made between the maker of a note and deed of trust and the payees of said note, stipulating that if it shall be found by the court that the transaction is usurious, the payee shall receive interest at the rate of six per cent on the principal of the debt. The transaction will be purged of usury by a decree of the court, visiting the penalties of the statute upon both the borrower and the lender, by giving to the usurer only his principal, and to the school fund a judgment against the debtor for ten per cent thereon. The rule in equity is the same as at law.

14. —— JUDGMENT FOR INTEREST. In rendering a judgment in favor of the school fund, upon a usurious note which upon its face calls for interest at the rate of ten per cent, interest will be computed upon the principal from the maturity of the note to the date of the judgment.

15. Decree: PLEADINGS. The court will not decree to the defendant affirmative relief when none is asked in his answer.

16. Usury: SECURITIES. When A. executed notes and a deed of trust to secure the same, and placed them in the hands of B., to be sold in the market to raise money to be applied in the payment of a usurious debt to C., and they were so sold, it was held, that they were not tainted with usury.

17. —— If there was an additional agreement between A. and B., that in the event the securities were not sold, they should be retained by B. as evidences of the indebtedness of A. to C., they would not, by reason of such agreement, be tainted with usury, if actually sold.

*Appeal from Johnson District Court.*

WEDNESDAY, DECEMBER 7.

THIS is an application in chancery to restrain the sale on three different deeds of trust, upon the ground that nothing is due upon the same, when purged of the usury contained therein, and credited with the payments which have been made. The first of these deeds of trust was for sixty thousand, the second for twenty-five thousand, and the third for ten thousand three hundred and sixty-seven $\frac{15}{100}$ dollars.

At the trial (11th May, 1863), the court found due, on the first trust deed, $43,043.47, and rendered a decree for that sum in favor of the defendants—Lee, Higginson & Co., of Boston, being the holders thereof; that the second deed of trust was untainted with usury, and granted permission to the trustee to sell the property therein specified, for the benefit of the defendants, Townsend & Washburne, the holders and owners thereof; and as to the third deed of trust, the petition was dismissed, without prejudice to any one, for the reason that the parties thereto did not appear to be before the court.

Plaintiffs appeal. The remaining facts, so far as deemed necessary, will be found stated in the opinion of the court.

*Grant & Smith* for the appellants.

*Lindley, Stewart, Armstrong* and *Drury* for the appellees.

Lowe, J. — The several deeds of trust, described in the petition, are found to belong to different parties, of distinct relationships, and, therefore, their joinder in one suit is not understood; but the objection to the proceeding on this account was subsequently waived, and we proceed to con-

sider each with the class of questions thereto belonging, separately.

We begin with the $60,000 claim. The plaintiffs allege that when purged of its usury, and credited with the payments made, that the same is satisfied and should be canceled. Their statement in regard to its origin is substantially the following: That they were millers and merchants in Davenport, and, as such, had, prior and since January 20th, 1853, a deposit account with Cook & Sargent, bankers in the same city. By agreement they were to pay Cook & Sargent eighteen to twenty per cent interest upon the balance of the banking account, when against them, and to receive 6 per cent interest when in their favor. From time to time plaintiffs sold to their bankers notes and bills of exchange at usurious rates of interest from the date last aforesaid up to a late period. On the 17th of July, 1856, it was found that they were nominally indebted to their bankers in the sum of $68,507.44; but that all of this sum except $29,313.36 was for unlawful interest, nevertheless that Burrows and wife made a deed of trust upon certain property therein described, to secure $60,000 of the above specified sum, payable in three years, together with certain usurious coupon interest notes; that the residue of said sum, namely, $8,507.44 was within three or four days thereafter increased by some charges of insurances, usurious interest, &c., to $10,291.55, and was liquidated on the 21st of July, 1856, with exchange on New York at four months, which plaintiffs claim to have paid. Exclusive of this last sum, and exclusive of the unlawful interest, the plaintiffs claim that there was in fact only due to Cook & Sargent on the 17th day of July, 1856, the sum of $20,873.38, and that they have since then paid on said deed of trust $24,750; that six per cent interest upon this amount from time of payment to the 1st of February, 1860, would make the sum $27,882.53. The

same interest on Cook & Sargent's real account or claim, namely, $20,873.38, up to February 1st, 1860, would make the same $25,305.81. Leaving the whole debt paid, and a balance in favor of the plaintiffs of $2,576.72. These statements, with the exceptions of the execution and delivery of the deed of trust under consideration, are met by a general denial on the part of the defendants, Lee, Higginson & Co., who claim to be the legal holders of said deed of trust, before due and without notice of the usury.

Cook & Sargent admit that plaintiffs, during the time specified, kept their deposit account with them, and agreed to pay eighteen to twenty per cent interest, when the same was against them, and to receive six per cent when in their favor. They admit that on the 17th of July, 1856, the plaintiffs were indebted to them in the sum of $68,507.44, but deny that any part thereof was usurious. They deny that the purchase of notes and bills of exchange by them of the plaintiffs were at usurious rates, or that the plaintiffs ever paid the note dated July 21st, 1856, calling for $10,291.55, &c.

As bearing upon the complaint of usury, there are one or two preliminary questions which we may first dispose 1. INTER-EST: Code of 1851. of. One is, that the deposit account between the parties (which is alleged to be continuous in its character) commenced under the Code of 1851, which contained no usury clause, in the provisions regulating the interest upon contracts, but simply fixed the rate of interest at six per cent, unless a greater amount was contracted for in writing. Under this law no greater interest than six per cent could be lawfully charged, unless there was an agreement in writing to pay more.

The position of the defense is, that notwithstanding the contract in its original concoction, was in this regard illegal, 2. —— Promissory note. being verbal, yet that the objection on this account was unavailable to the plaintiffs, first,

because they subsequently legalized the same by reducing it to writing, that is to say, by giving their notes, secured by the deed of trust now in controversy, which included the unlawful interest.    But, secondly, if such a consequence did not follow, nevertheless illegality of consideration, unlike usury, could not be urged as an objection against the recovery of the notes in the hands of innocent holders who had taken an assignment of the same before due, without notice of the alleged infirmity.    The soundness of this position we are not prepared to gainsay — we believe it to be good law.    But while the unlawful interest charged between the 20th of January and the 8th of March, 1853, inclusive, is not now available to the plaintiffs as against Lee, Higginson & Co., innocent assignees, the same being simply illegal and not usurious; still the contract to pay the same being in parol, had not the effect (although the transaction between the parties was a continuous one) to prevent the usury law of the 8th of March, 1853, from taking effect upon the dealings and transactions of the parties after that date, so that whatever usury was charged against the plaintiffs since then, is available to them against any and all persons, who may attempt to enforce the collection of the same.

The other preliminary question to be noticed, is founded upon the statement, that on the 1st of April, 1856, J. C.
4 USURY: Davie was admitted as a new member of the firm change of firm. of Cook & Sargent, and thereupon a new set of books were opened at that date, and plaintiff's account, then found on settlement to be $32,168.76, more or less, was transferred to the same, and, at their request, paid by the new to old firm.    This change in the membership of the firm is claimed to have the effect to foreclose all questions of usury in the dealings of the parties anterior thereto.    Such is not our opinion.    We have heretofore held, that if the consideration of a claim is infected with

VOL. XVII.—56

usury, the *taint* thereof follows it in all the mutations through which it may pass from or through the usurer, either in the description of the paper that may be given to evidence the same, or the individuals who may be made new parties thereto. If the consequences of usury may be avoided by the introduction of a new member into a banking or other firm, it could be made a most easy, not to say simple, device for evading the most stupendous infractions of the usury laws.

The next question is one of very great importance, constituting, indeed, the chief point of difference between the parties in regard to the $60,000 trust deed. It is, 5. — Bill of exchange. whether the various drafts, bills of exchange and acceptances drawn by plaintiffs against shipments of produce were cashed by defendants, Cook & Sargent, at usurious rates? That they were purchased at a discount greater than legal interest, is not seriously controverted. But, conceding this to be so, the question is, whether in legal contemplation it comes within the meaning and intent of the usury law, and makes it a violation of the same. If they had been time drafts drawn on the same place where discounted, then we suppose a greater interest could not be reserved than that specified in the usury law. And it is to this class of cases almost exclusively, with one exception, that the authorities referred to by plaintiffs' counsel upon a closer examination will be found to apply. But where they are drawn on New York, St. Louis, or other distant points, as in this case, besides the ordinary discount of lawful interest, it is customary, as it is competent for banks and brokers, to charge and receive something more than legal interest, to cover the difference of exchange as well as the risk and trouble of collecting. Parsons, in his late work on Bills and Notes, vol. 2, 433, recognizes this custom as legal, and cites, in a note, the various authorities which sustain the same doctrine; and

they hold, that whilst it has no defined limits other than those which usage may prescribe, it is no infringement of the usury law. It does not necessarily involve the principle of a loan, but is regarded in the eye of the law as a sale of absent funds, or funds to be realized by future shipments from the hands of a foreign consignee; such a transaction stands much upon the footing of the sale of one's credit, or the sale of depreciated paper, which are held not to be inconsistent with the usury laws. 2 Parsons, Notes and Bills, 432–434, and authorities cited.

The principle under discussion is supported by a large number of adjudicated cases; one of the best considered of which, perhaps, is the case of *Andrews* v. *Pond et al.*, 13 Peters, 65. In that case, ten per cent in addition to the legal interest was reserved to cover the rate of exchange between New York and Mobile, and it was held, that this did not render the transaction usurious, unless it was made to appear that it was a mere cover for an usurious loan.

The case of *Earll* v. *Mitchell et al.*, 22 Ill., 530, is comparatively a recent case, very similar in its facts and circumstances, as well as the legal questions raised, to the case at bar. The transaction between the parties was upheld, as not affecting the policy of the usury laws.

The same doctrine or principle is very clearly elucidated by HARRIS, Justice, in the case of *Leavitt* v. *De Launy*, 4 Comst., 364, pointing out the elementary difference between a loan of money and a sale of exchange, the latter of which, in effect, is simply a transfer or sale of funds which the drawer has, or is supposed to have, at some different point or place to the purchaser. Usually, in such a transaction, there is no unconditional stipulation to repay the value of such exchange; yet this would be an essential element of usury; for it is said, three things must combine to render any contract usurious: *First.* There must be a loan, expressed or implied. *Second.*

.6. ——.General rule.

There must be an agreement that the money lent, or that which was taken as an equivalent thereto, shall be repaid, and that without condition or contingency.  *Third.*  There must be an agreement to pay a greater rate of interest than that allowed by statute.  Now, the drafts which the plaintiffs drew on New York and other places, against shipments of flour and other produce, and sold to the banking house of Cook & Sargent (a transaction by no means unusual), are evidently wanting in one or more of the essential elements to constitute usury.

And yet, as some of these authorities have said, and as this court has said, in the case of *Nichols* v. *Levins et al.*, 15 Iowa, 362, if the parties have resorted to this form of selling a note or a bill of exchange, to disguise a usurious loan, it should be treated as a violation of the usury law; but it is incumbent on the party complaining or impeaching it, to remove the covering by competent evidence, and exhibit the transaction as a loan of money.  It therefore becomes a pertinent inquiry, in this case, whether the sale on the one hand, and the purchase on the other of these drafts, drawn against produce actually shipped, were what they purport to be on their face, a *bona fide* transaction, or simply a device to cover a usurious loan.  We are free to confess that we have been unable to discover, in the whole case, anything that would authorize the latter inference.

7.—— When bill is usurious.

The parties commenced this course of dealing before the passage of the usury law, and continued it for years after, so far as we can learn, without any allusion thereto, or the provisions of the usury law coming within their contemplations.

It is proper to state, before leaving this branch of the subject, that, in our opinion, the accommodation acceptances by Antoine Leclaire, and perhaps others, made and to be paid at the same place where given, would not fall

within the principle which we have been discussing. But, on the other hand, if they were cashed by Cook & Sargent at a discount greater than legal interest, the same would justly be assailable for usury.

As it respects this branch of the case, there is still one other point of difference between the parties which needs 8. PROMIS- some explanation, before we are prepared to state SORY NOTE: evidence. the general result of our examination of the matters and things touching the plaintiffs' complaint as applicable to the $60,000 deed of trust. On the 17th of July, 1856, ostensibly the account between the parties stood $68,507.44 against the plaintiffs. At that date, $60,000 of that amount was settled by notes and deed of trust, at three years, and the plaintiffs received a credit therefor on the books of the bank. Four days thereafter, the residue of the account ($8,507.44) was increased to $10,291.55. This last sum was settled by bill or exchange on New York, at four months. It was not paid at maturity in New York, whereupon B. & P. took up the same by checking on Cook & Sargent for the amount thereof, and they now produce the acceptance as well as the check with which it was paid as evidence of its settlement. The question is, whether, in fact as well as form, this amount has been paid by B. & P. If so, then what effect, if any, is to be given to said payment in adjusting the balance claimed to be due on the $60,000 deed of trust. On the 24th of November, 1856, when this note or acceptance was taken up, by checking on Cook & Sargent, the account current between the parties was largely against B. & P., and the immediate effect of that operation was simply to re-introduce into the running account between the parties the $8,507.44 which formed a part of it at the time the $60,000 deed of trust was given, and which was settled by note or acceptance on New York and a credit given therefor. But on the 1st of February, 1857, about two months thereafter, the bank

books show a settlement between the parties, at which a balance was found against B. & P., of some $13,298.85 ; and the books further show, that during the two months immediately succeeding this settlement, B. & P. placed in bank to their credit over $100,000, and that their deposit account, during these two months, was largely in excess of all amounts that had been checked out, so that there can be but little doubt that the sum of $10,291.44 had been paid, as also shown *prima facie*, as we think, by the production of the original note payable in New York, and the check that paid it.

Now, $8,507.44 of this amount, on the 17th day of July, 1856, formed a portion of the indebtedness claimed to be due, at that time, to Cook & Sargent, a part of 9. Usury: which, at least, is evidently usurious, a payment payment. of which is, in law, a payment on the principal debt. What portion of it, however, is usurious cannot be ascertained, except in connection with the whole account as it stood on the 17th of July, 1856, namely, $68,507.44, which is an entirety, and of which the $8,507.44 constituted an integral part. Hence, all the computations made on either side to ascertain how much usury there was in the deed of trust, or how much legal interest should be allowed on the open account, which formed a part of the considerations thereof, came down necessarily to the 17th of July, 1856, which included the $8,507.44. For instance, the usury on the open account, down to that date, was found to be $15,502.20. Now, as this embraced the usury in the $8,507.44 item, as well as the deed of trust, so it should be deducted from the aggregate of both amounts, namely, $68,607$\frac{44}{100}$, and as a matter of course, as the $8,507.44 has been paid, so it should be credited as a payment on the deed of trust.

There are one or two other matters yet to be settled, before we are ready to state our final conclusion. This

deed of trust was given to secure four notes of $10,000 each, and four notes of $5,000 each, all running three years, together with ninety-six coupon interest notes, payable every three months, amounting in their aggregate to ten per cent interest per annum on the $60,000. In addition to these, there were given thirty-six other interest notes of $250 each, payable monthly, amounting to five per cent per annum on the same sum. So that we find, as a matter of fact, that the interest reserved on these notes and deed of trust was fifteen per cent per annum.

Again, the original consideration of this trust deed consists of two classes of accounts: *First.* A running open account, and a few notes and acceptances, which **10. Drafts.** we find were usurious; and, *Second.* But largely, interest and rates of exchange reserved on various notes, drafts and acceptances which had been from time to time discounted. All these, payable elsewhere than the place of discount, are not usurious, for reasons which we have already stated. Whether they would be usurious, if it was shown just what the rate of exchange between Davenport and New York, or St. Louis, was at the time, and the amount charged for the discount was in excess of the legal interest and such rate of exchange, we need not, and do not now decide. Such a state of case is not before us. We have no proof in this case submitted to us, what the difference of exchange between these places was at the time, and we can take no judicial knowledge of the same.

But it must be observed that there is a distinction between foreign and domestic bills of exchange. Whilst **11. Domestic bills.** bankers are permitted to charge more than legal interest on the former to cover the rate of exchange, the same reason does not apply to the latter, because they are collectable at home. Hence, the charges made for cashing Leclaire's acceptances, and the renewal thereof up to July 17th, 1856, being usurious, should be

excluded; so in regard to Burrows & Prettyman's notes and acceptances, although the principal may not be paid, they have been renewed or continued, yet the books show a large amount of usury reserved, and charged into the account, and formed a part of the consideration of the present deed of trust. This, of course, should be taken out. With regard to the acceptances by Gamage, payable in New York, made purely for the accommodation of B. & P., they do not, on that account, occupy any different position in law, than do the acceptances drawn against the shipments of produce, which are not, in the meaning of the law, accommodation paper. It is just as competent, legally, in discounting or buying accommodation paper drawn upon a foreign house to charge extra interest for the rate of exchange, as it would be for other business paper. There is no difference in reason as there cannot be in law. The acceptances by Gamage, therefore, are not usurious in the attitude in which the case is placed before us.

We are now in a condition, upon the basis we have thus prepared, in settling the questions of law and fact involved in the case, to state what we understand and believe to be the amount due Lee, Higginson & Co. on this deed of trust. Of course, in a controversy about usury, they stand in no better condition than Cook & Sargent do, notwithstanding they may be innocent holders of the paper. In doing so we are not at liberty to adopt the mode of adjustment proposed by the parties; that is to say, after purging out the usury to allow six per cent interest. This, of course, would suit both parties a little better than the statutory mode, for the usurer gets, besides the principal debt, legal interest, and the other party pays but six per cent to the plaintiff, instead of ten per cent to the school fund. But this method of adjusting the controversy would defeat the whole policy of the usury law. Equity must, in this respect, follow the

requirements of the law. We see no reason to make this case an exception, and to depart from our usual method of adjudicating cases of this description. We find the transaction between the parties usurious. It was this that gave rise to the controversy. In determining the rights of the parties thereto, we must observe the express provisions of the statute, that is, to allow the usurer no interest, and to require the other party to pay the requisite penalty to the school fund.

How much usury then does the $60,000 deed of trust contain? And what amount of payments have been made on the same? We proceed to answer these two questions: In the first place, we say the illegal interest charged upon the open account between the 20th of January, 1853, and the 8th of March of the same year, being nearly $100, is not usury, as we have shown, but simply an illegal charge (the contract for the same being in parol), which is unavailable as against Lee, Higginson & Co., innocent assignees, and, therefore, must stand. The usury law took effect March 8th, 1853, and the usury upon the open account from that date to the 17th of July, 1856, we find from the books to be,..................... $15,502 20

The usury charged on the Leclaire acceptances, prior to the 17th July, 1856, and which forms a part of the consideration of the deed of trust, was,................. $2,132 10

The usury charged on Burrows & Prettyman's notes and acceptances prior to July 17th, 1856, and which makes a part of the consideration of the deed of trust, was,...... $2,060 00

Making an aggregate of,.................. $19,694 30

This is to be taken, for reasons above suggested, not from the $60,000 deed of trust, but from the entire account, with reference to which all the calculations have been made,

| | | |
|---|---|---|
| Namely,................................ | $68,507 | 44 |
| Deduct, .............................. | 19,694 | 30 |
| Leaving a balance of..................... | $48,813 | 14 |

The payments on this sum are:

| | | |
|---|---|---|
| 1st. As we have seen,............. $8,507 44 | | |
| 2d. Coupon and interest notes taken | | |
| up, ..................., ....... 24,828 75 | | · |
| Which makes in the aggregate,.............. | 33,336 | 19 |

Leaving a balance of principal of........... **$15,476 95** for which amount the deed of trust may be foreclosed in favor of Lee, Higginson & Co., by the trustee, and a judgment rendered against Burrows & Prettyman in favor of the school fund for ten per cent on this amount from the 17th of July, 1859, when the notes matured, up to the commencement of this term, being five years, four and a half months, amounting to $8,318.86. Whilst a judgment may be thus rendered against the plaintiffs for the sum last named, it is not in our opinion competent for us in the present condition of the record, to render a judgment of foreclosure in favor of the defendant, Lee, Higginson & Co., for the amount found due to them, for the reason they have asked no affirmative relief in their answer, unless it should be with the consent of the plaintiffs. If that is hereafter obtained, and the defendants aforesaid request it, a final decree of foreclosure may still be entered, and for this pur- pose the cause will be remanded.

We next give attention to the $25,000 deed of trust made on the 8th day of September, 1858, by Burrows and wife on their homestead, to Antoine Leclaire to secure four notes also drawn to Leclaire, of that date, one for $10,000, and three for $5,000 each, with cou- pon interest notes attached thereto, payable every six

months at the rate of ten per cent interest. These notes and deed of trust running three years, were sold in Boston early in January, 1859, or about four months after their issue, at a discount perhaps of ten per cent to the defendants Townsend & Washburne, who are the present owners and holders thereof. The plaintiffs claim that the consideration of these notes, was to liquidate a supposed indebtedness of them to Cook & Sargent; and that they were drawn to Leclaire only as a matter of form, and because he was liable for them in the sum of $10,000 as an accommodation acceptor, which constituted a part of the consideration of the same. They further claim that these notes and deed of trust are largely usurious, and that upon an equitable adjustment of the account as it stands between them on the one part, and Cook & Sargent on the other, nothing would be found due thereon, and that the same should therefore be given up and canceled. But whether this is so or not, it is claimed by defendants, can make no difference, for the reason that this paper was thrown in market by the plaintiffs to be negotiated for, and in their behalf, which was accordingly done, and that such a defense or objection to the payment of the notes, is not allowable as against the purchasers and present holders. This, as a legal proposition, does not seem to be controverted, but the fact that it was sold for the plaintiff's use, and on their account, is denied by them, and they insist that the converse is true; that Cook & Sargent were the real parties to that transaction, and that it was done at their instance and for their benefit. This becomes, therefore, an important antecedent question to be determined, and as bearing upon it, we have carefully reviewed all the testimony on both sides, and are constrained to hold, that upon this point the preponderance of the evidence is with the defendants. We shall not discuss it, however, in all its minutiæ, because

not necessary, but shall limit ourselves simply to a statement of its general import.

In the first place, Ebenezer and J. P. Cook and John C. Davie, testify directly and positively to facts which sustain the defendants' side of this issue, namely, that these securities were got up by plaintiffs expressly to be sold in market, and that they were sold in Boston, by their procurement and on their account. The proceeds of such sale, to be sure, were to be applied on their indebtedness to Cook & Sargent, the payment of whom would also, at the same time, relieve Leclaire of his liability as acceptor to the amount of ten thousand dollars. The testimony of these three witnesses is further corroborated by that of Sargent, who was in Boston at the time, and to whom, as agent or broker, was intrusted the sale of these securities. He states that he received the notes and deed of trust through the banking house at Davenport, to sell for, and on account of Burrows & Prettyman; that as such, he effected a sale of the same to the defendants, Townsend & Washburne, and reported the fact to Cook & Sargent, at Davenport, by letter, under date January 7th, 1859, in which he charged the same commissions that he was in the habit of doing for the sale of other like securities, namely, ten per cent. This letter is made an exhibit in the case, showing that this charge of commissions was made at the time, before any trouble or controversy was or could have been anticipated, and it is wholly irreconcilable with the idea that the said securities were the property of Cook & Sargent, and as such sold for and in their behalf; for, upon this hypothesis, such a charge would be absurd.

In opposition to all this, we have the direct testimony only of one of the plaintiffs, who, really, as we suppose, understood the transaction differently, believing, as we interpret his testimony, that, inasmuch as the proceeds of the

sale were to go to Cook & Sargent, the securities belonged to them, and were negotiated on their account. Now, it is conceded that whilst this testimony, standing alone, does not outweigh that of the defendants', yet that, when taken in connection with certain extrinsic facts and circumstances, papers and documents corroborating it (and which are referred to), that it does have that effect.

Such, however, is not our opinion. These facts and circumstances, properly interpreted, will be found in the main to harmonize with the theory of the defendants' case, at least not necessarily inconsistent therewith. Of the various corroborating facts alluded to, and relied upon by plaintiff's counsel, the following written agreement between Leclaire and Cook & Sargent may be set down of the best and highest type.

Agreement, 11th September, 1858, between C. & S. and A. Leclaire: Whereas, Burrows & Prettyman have executed notes to the amount of $25,000, principal and interest, notes at ten per cent, principal due in three years, payable to A. Leclaire, and a deed of trust on certain property therein described; and whereas the interest of A. Leclaire in said notes and mortgage is $10,000, and the interest of Cook & Sargent $15,000, and it is proposed to sell said notes and security, now it is agreed, that if said notes shall be sold, with the proceeds thereof shall be taken up two acceptances of $5,000 each, of Leclaire, drawn by B. & P., and delivered to said Leclaire canceled. And if not sold, the interest of each of said parties is to remain the same as above, except that Leclaire's lien is to take precedence of C. & S. If the notes of B. & P. should not be paid at maturity, and proceedings are had to foreclose and sell the property upon the deed of trust, Leclaire's lien is to be first satisfied.

(Signed)             A. LECLAIRE,
COOK & SARGENT.

Upon the back of this agreement is indorsed, it is said, by J. P. Cook, the following statement: "We have sold the within deed of trust, and applied $10,000 of the money received therefor, to the payment of that amount of Mr. Leclaire's acceptances for B. and P."

It is contended that the above indorsement and agreement contain an acknowledgment of Leclaire's and Cook & Sargent's ownership of and interest in said securities, and that the same were sold not by them as agents, but *for them* as owners and parties interested.

The object, unquestionably, of putting these securities in market was to raise money to pay an indebtedness of $25,000 to Cook & Sargent, and at the same time extinguish Leclaire's liability as acceptor for the sum of $10,000, they, therefore, had a direct resulting interest in these securities the moment they were executed and delivered; and the alleged language of ownership, which it is claimed the agreement aforesaid contains, may readily be referred to this sort of an interest.

The Leclaire interest consisted simply in that of a contingent liability, whilst that of Cook & Sargent consisted of the indebtedness itself, yet the securities all run in Leclaire's name as payee, hence the propriety of having some agreement between them, to show the actual relative interest of each, and just how the funds should be applied when realized. And this seems to have been the only purpose of the agreement. But even if there had been a distinct understanding between the parties, that in the event the securities did not, or could not be sold, then Leclaire and Cook & Sargent were to hold the paper for themselves, as the evidence of plaintiffs' indebtedness to them (and this is understood to be what the plaintiffs claim that the agreement in part shows), still that this could not alter the rights of Townsend & Washburne, so as

to let in the objection of usury. To illustrate, if A. make a security of some kind to B., for the purpose of placing it in the hands of a broker to sell in market, to raise money to pay C. an usurious debt (and this is the case before us, according to the testimony), the purchaser in such case would be unaffected with the question of usury, because the transaction would lack one of the important elements of usury, namely, a loan of money or its equivalent, expressed or implied. The transactions would simply be the sale and purchase of paper as any other commodity in the market. To be sure, it would be otherwise, if the parties resorted, with a knowledge of the purchaser, to this method of raising money, to cover up an usurious loan. In all such cases the law would deem it a loan of money, under the disguise of a sale.

But the transactions before us present no such state of case. We find no fact indicating in the least degree, that the subject of usury was at all in the minds of the parties implicated, when the arrangement was entered into. Leclaire, to get rid of one, was willing to incur a larger liability, and the securities ran in his name, not as a device to cover usury, but, as we have reason to believe, to secure, by his superior credit and indorsement, a more ready negotiation of the paper.

Well now, to complete the illustration, suppose in the case just put, that in addition to the arrangement to place A.'s paper in market to pay a debt due from him to C., there should be a further side agreement between A., the maker, B., the payee, and C., the creditor, that in case the paper does not sell, B. shall retain the same as evidence of that amount of indebtedness to C., would the existence of such a contract, in the event paper sells, have the effect to render the same usurious in the hands of an innocent purchaser? The statement of such a proposition would carry its own answer. Without more, it is plain, it would

not have the effect to convert the sale and purchase of the paper into a loan of money, and yet, unless it had the element of a loan, the purchaser could not be affected with the question of usury, even if he had knowledge of such outside agreement.

We therefore cannot give to this agreement the effect claimed for it by plaintiffs' counsel; nor do we think the other facts and circumstances relied upon, so strengthening the plaintiffs' evidence, as to make it overcome that of the defendants. They are less strong than the agreement which we have been considering, are all susceptible of the same general solution; we feel, on that account, that it is unnecessary to state and answer each separately. As it respects this deed of trust, we conclude the judgment below should be affirmed. With regard to the $10,367$\frac{15}{100}$ deed of trust, finding no proper parties before the court, we make the same order that the court below did, dismissing the bill as to it without prejudice. The costs of this court and the court below, will be equally divided between the plaintiffs and the defendant, Lee, Higginson & Co.

DILLON, J., being the trustee in one of the deeds of trust, and all of the other members of the court agreeing, he took no part in the determination of the cause.