JOHN C. BROWN, Admr., *v.* R. C. GARDNER.

1. A contract for the sale of a plantation, with the personal property thereon, lying in Tennessee, the grantor domiciled in Athens, Alabama, the grantee in Nashville, Tennessee, each of these places being at the time within the lines of the military forces of the United States, is not invalid, either by reason of the non-intercourse acts of Congress or the rules governing the intercourse of belligerents during the late civil war, as expounded by the Supreme Court of the United States in *Montgomery* v. *The United States*, 15 Wall., and *The United States* v. *Lapene*, 17 Wall. Nor is a deed made in pursuance of such a contract void, although when it was executed, Nashville remaining within the military lines of the United States, Athens, Alabama, and that portion of Tennessee in which the plantation is situated, had been reöccupied by the Confederate forces, both grantor and grantee actually residing within their lines.

10—VOL. 4.

Brown *v.* Gardner

2. Per Malone, Sp. J.: The United States had the right to place whatever restrictions it saw fit upon the trade between citizens of the Confederate States within its lines of military occupation and those without those lines, and when these restrictions are announced through the proper department it is the duty of the State Courts to observe and enforce them.

3. A note executed in Tennessee, by a citizen of that State, to a citizen of Alabama, bearing on its face interest at the rate of eight per cent. per annum, the legal rate in Alabama, is manifestly an Alabama contract, and is valid.

4. A contract for the sale of land upon credit is not usurious, because the price agreed on is a sum equal to one for which the land had been offered to the purchaser, cash, plus ten per cent. per annum thereon for the time credit is given

5. During the late civil war the owner of negroes who had conveyed them to a trustee to secure their purchase money, both owner and trustee residing in Tennessee, attempted to remove them from that State for greater security. The *cestui que trust* persuaded the negroes to remain. *Held:* The *cestui que trust* had the right so to do, and if loss ensued it is *damnum absque injuria.*

FROM GILES.

Appeal from the Chancery Court of Giles County. W. S. FLEMING, Ch.

F. M. JONES and J. S. WILKES, for Complainant.

ED. BAXTER and BRIGHT, for Defendant.

COOPER, J., having been of counsel, took no part in the decision.

THOMAS H. MALONE, Sp. J., delivered the opinion of the Court.

On the 7th day of May, 1862, Richard W. Vas-
ser and R. C. Gardner entered into the following
contract in writing:

"Memorandum of an agreement made in Athens,
Alabama, this, the seventh day of May, 1862, be-
tween Richard W. Vasser, of the County of Lime-
stone, State of Alabama, and Richard C. Gardner,
of the County of Davidson, State of Tennessee:
Whereas, the said R. W. Vasser has sold to said
Gardner his tract of land, near Elkton, Tennessee,
containing about fourteen hundred and forty-five
acres; also all the negroes on said plantation, about
ninety in number, and all of the stock, corn, fod-
der, farming utensils, together with all and every
kind of property on or belonging to said planta-
tion, for which the said Gardner is to execute to
the said Vasser his notes as follows: four thousand
dollars payable on the 1st of January, 1863; four
thousand dollars payable 1st of January, 1864;
four thousand dollars payable 1st of January, 1865;
four thousand dollars payable 1st of January, 1866;
four thousand dollars payable 1st of January, 1867;
and forty thousand dollars payable 1st of January,
1867; all to bear interest at the rate of eight per
cent. per annum if not paid at maturity. Said
notes to be executed, and the deed and bill of sale
to be executed at the earliest convenience of both
parties.

"The said Gardner is to give a deed of trust
on all of said property, both real and personal, to

secure the payment of the purchase money for which the said notes are executed.

"The said Vasser has the right to exchange other negroes of the same value for any he may think proper to select of the negroes aforesaid.

"The said Gardner is to have the proceeds of said plantation for the year, and is to pay all the expenses of every kind in carrying on said plantation from the 1st of January, 1862, and is to furnish to said Vasser this year, to be delivered on said plantation, seventy-five bushels of wheat and one hundred bushels of meal.

"R. W. VASSER.
"R. C. GARDNER."

The record shows that the place and date of the contract and the residence of the parties are correctly recited, and that Limestone County, Alabama, and Davidson County, Tennessee, were then occupied by the military forces of the United States.

On the 8th of May, 1862, Gardner took possession of the property, and a few weeks thereafter removed his family to the farm, and resided there until the autumn of 1863. About the 1st of September, 1862, the Confederate forces again occupied both Limestone County, Alabama, and Giles County, Tennessee, while Davidson County remained permanently in the hands of the Federals.

On the 3rd day of November, 1862, Vasser and Gardner met at Pulaski, in Giles County, and executed the deeds provided for in the contract of

May 7th.   Whether the notes were then executed and delivered, or whether this had been done some weeks previously in Athens, Alabama, is somewhat doubtful, but not very material.   In the deed of trust Gardner recites that he is a resident of Giles County.

After the battle at ·Murfreesboro, in January, 1863, Gardner made an effort to remove the slaves further south to a place of greater safety.   This effort failed through the interference of Vasser, who claimed that, having a trust deed of the slaves to secure the, purchase money due him, Gardner had no right, while such purchase money remained unpaid, to remove them beyond the jurisdiction of Tennessee.   The slaves remained upon the place until Giles County was again occupied by the Federal forces, and were freed by the events of the war.

Vasser died in 1864.   After the close of the war John C. Brown was appointed administrator of his estate, and Gardner made to him large payments upon his notes.   He did not, however, meet them promptly at maturity, and on the 29th of January, 1869, Brown filed his bill in the Chancery Court at Pulaski to foreclose the trust deed.   After the bill was filed, proceedings were stayed in consequence of the promise of Gardner to pay the balance remaining due within a specified period, and, in fact, over $15,000 were paid by him between the date of the filing of the bill and September 17th, 1870, but having ·failed to

meet a draft drawn on him by Brown, in April, 1871, the latter at once resumed active proceedings in the cause.

On the 10th of July, 1871, Gardner filed his answer, setting up and relying upon the following defenses :

1. That the original contract, and the deed, and the deed of trust, executed in pursuance thereof, were in violation of the non-intercourse Acts of the United States, and of the general law of the land, and are void.

2. That the notes executed to Vasser, and the contract on which they were based, are usurious under the laws of Alabama, and are void as to the whole interest.

3. That he was greatly damaged by the interference of Vasser when he attempted to remove the slaves South, and that he is entitled to set off this damage against any balance due upon the notes.

Proof was taken, and upon final hearing the Chancellor rendered a decree in favor of Brown, as of November 25th, 1875, for $48,304.18, and thereupon an appeal was taken to this Court.

It is conceded by counsel for the defendant that the case of *Shaw* v. *Carlile*, decided by this Court in April, 1872, and reported in 9 Heis., is, if it should be adhered to, conclusive against them so far as their defense is based upon a presumed illegality in the original contract, arising out of an alleged violation of the non-intercourse Acts of

Congress, or the general rules of international law governing the intercourse of belligerents. But it is urged that since that decision was rendered two cases—*Montgomery* v. *United States*, 25 Wall., and *United States* v. *Lapene*, 17 Wall.,—have been decided by the Supreme Court of the United States, which are in conflict with *Shaw* v. *Carlile*. It is properly taken for granted that this Court will promptly conform its decisions to those of the Supreme Court of the United States on all questions regarding the proper construction of the Acts of Congress, and will, moreover, yield the very greatest consideration and deference to the opinions of that high tribunal, even when not bound in duty to follow them, and this Court is requested to review and reverse its ruling in *Shaw* v. *Carlile*.

In that case the material facts are that in November, 1862, Mr. Shaw, residing in Augusta, Georgia, sold and conveyed to Mrs. Carlile, domiciled and actually residing in Memphis, Tennessee, a life estate in a tract of land lying in the latter city. Memphis was then in possession of the military forces of the United States, while Augusta was held by the Confederates. The purchase was effected by an agent, who passed through the Federal lines for that purpose.

This Court held the sale valid.

In *Montgomery* v. *United States*, the material facts are, that Burbridge, a loyal citizen of the United States, residing in New Orleans, had been, prior to the occupation of that city by the Federal

forces, the agent and factor of one Johnson, re-siding in the parish of LaFourche, Louisiana. After the occupation of New Orleans by General Butler, and while the parish of LaFourche re-mained in the hands of the Confederates, Bur-bridge, describing himself as agent of Johnson, agreed to sell to Montgomery, a British subject domiciled in New Orleans, a crop belonging to Johnson, on which Burbridge had made advances above its value, and then on Johnson's plantation, in LaFourche Parish, describing the property as Johnson's, and in no way referring to his own in-terest in it.

The Supreme Court of the United States held that the sale was void.

In *United States* v. *Lapene*, the facts are, that Lapene & Ferre, a firm of merchants doing busi-ness and residing in New Orleans, before the cap-ture of New Orleans by the forces of the United States, sent out a clerk to the country parishes of Louisiana to collect debts due the firm and to in-vest such collections in cotton. After the capture of New Orleans, and while the rest of Louisiana remained in the hands of the Confederates, the agent made purchases of cotton for his firm.

The Supreme Court of the United States held that Lapene & Ferre were guilty of trading with the enemy, Mr. Justice Miller and Mr. Justice Field dissenting.

It is obvious that if these three cases be con-fined to the precise points decided, they are not

Brown *v.* Gardner.

necessarily in conflict. Indeed, in *Montgomery* v. *United States*, Mr. Justice Strong delivering the opinion of the Court, quotes approvingly from the opinion of the Supreme Court of Massachusetts in *Kershaw* v. *Kelsey*, 100 Mass., 561, a case much like *Shaw* v. *Carlile* in its material facts, and upon which the latter case is largely founded.

It is equally obvious that there is no conflict with regard to the construction to be placed upon the proclamation of President Lincoln, of August 16, 1861. In *Shaw* v. *Carlile* it was argued that the proclamation was intended to regulate the commercial intercourse between the people of the United States and those of such portions of the Confederate States as might be occupied by the Federal forces, that it did not apply to the intercourse between the people of such occupied territory and those of the rest of the Confederate States, nor to sales of real estate situated in the territory of one of the belligerents by a citizen of the other.

In *Montgomery* v. *United States* and *United States* v. *Lapene*, the contracts were in the strictest sense commercial, and were well calculated, not only in theory, but in fact, to give aid to the enemy. They were sales of merchandise, not real estate. The parties were separated by hostile lines, and the proclamation of the President was neither relied on nor mentioned. The opinion of the Court was based upon the principles of international law modified to meet the exigencies of our peculiar contest.

In these cases it is conceded, as held in *Shaw* v. *Carlile*, that ordinarily the line of non-intercourse is the boundary line between the territories of contending nations.

"But," says Mr. Justice Hunt, in *United States* v. *Lapene*, "the recent war in the United States was a civil war, in which portions of the same nation were engaged in hostile strife with each other. The State of Louisiana, although one of the United States, was under the control of the Confederate Government and their armies, and was an enemy's country. While the city of New Orleans was under such control it was a portion of an enemy's country. When that city was captured by the forces of the United States the line of non-intercourse was changed, and traffic before legal became illegal. This line was that of military occupation or control by the forces of the different governments, and not that of State lines."

These views, it must be admitted, are wholly irreconcileable with those expressed on this point in *Shaw* v. *Carlile*, but, as we have seen, that case was in part—and might have been exclusively—based on the position that sales and transfers of real estate by one belligerent to another are not inhibited by the laws of war.

This Court sitting in the State of Tennessee, now restored to its relations with the United States, and admitting their supreme authority under the Constitution and the laws made in pursuance thereof, should, as it seems to the writer, in all matters

of this character, adopt and enforce the views taken and expressed by the United States through the proper department. If, therefore, the case at bar were in its material facts like *United States* v. *Lapene*, the contract should, in the writer's judgment, be declared illegal.

But the cases are in no material feature alike. In that case there was a sale of cotton. In this case there was a sale of land, the personal property passing as an incident and to be used thereon. In that case the principals were actually separated by hostile lines. In this case no hostile lines intervened. In that case the property sold was actually situated within the lines of the enemy. In this case it was situated within the Federal lines at the time of the original contract, and when the deeds were executed the property was situated, and both of the parties were actually residing—whatever may have been their domicils—within the Confederate line.

The fact that Nashville was permanently held by the Federals, while Athens passed several times in quick succession from one of the belligerents to the other, seems wholly immaterial. The cases cited upon this point apply to the intercourse between citizens of the States adhering to the United States and the citizens of such portions of the Confederate States as might from time to time be occupied by the armies of the former.

And finally, it cannot be seriously insisted that under the law as held in *United States* v. *Lapene*,

the mere occupation of Nashville by the Federal forces would *ipso facto* impress upon one claiming Nashville as his domicil, but actually residing within the Confederate lines, the character of friend to the United States and enemy to the Confederate States. The doctrine of that case is manifestly applicable exclusively to traffic between parties actually residing on opposite sides of hostile lines, without regard to domicil.

This Court is therefore of opinion that the contract is not void by reason of the non-intercourse Acts of Congress or the laws governing the intercourse of belligerents during the late civil war, as expounded by the Supreme Court of the United States.

The second position taken by the defendant is that the original contract, and the notes executed in pursuance of it, are usurious under the laws of Alabama.

If regarded as a Tennessee contract, it would be usurious upon its face, because it provides that the notes after maturity shall bear interest at the rate of eight per cent. per annum.

But the parties were manifestly contracting, as they had the right to do, with reference to the laws of Alabama, and in that State eight per cent. per annum is the legal rate of interest. It is not, therefore, supposed that the contract is upon its face invalid, but proof has been made tending to show that the contract price of the property was $40,000, and [that the five notes for $4,000 each,

specified in the contract, were executed for interest upon the principal sum at the rate of ten per cent. per annum; and this, as it is insisted, renders the contract usurious under the peculiar features of the Alabama statute. The statute is in these words:

"All contracts for the payment of interest upon the loan or forbearance of goods, money, things in action, or upon any contract whatever, at a higher rate than is prescribed in this chapter, is usurious, and cannot be enforced except as to the principal; and if any interest has been paid the same must be deducted from the principal and judgment rendered for the balance only." Rev. Code Ala., sec. 1831.

It seems clear from the statements of Sloss— for no weight whatever is allowed to the casual conversations between the parties as understood and remembered by the blacksmith and the overseer— that Vasser regarded his property as worth $40,000, was willing to take that sum for it, and would sell upon time only on condition of receiving in addition, annually while credit was given, a sum equal to ten per cent. upon $40,000; and it is equally clear that he was apprehensive that the contract as proven, and by which his purpose was carried into effect, was obnoxious to the statute against usury. But, after all, the question is not what he supposed the law to be, but what it actually is.

Unfortunately the precise point seems never to

have been decided by the Supreme Court of Alabama, but counsel for the defendant insists that the Legislature of Alabama intended to make usury something different from what would be understood by the term at common law, and that to constitute usury in that State, it is not essential, as it is understood to be elsewhere, that there should be either a loan of money, or forbearance of a debt actually due. And in support of this position it is urged that this construction has been placed by the Supreme Courts of Indiana and Iowa upon the statutes of their respective States, which are conceded to be equally as broad and unlimited as that of Alabama; and we are cited to *Crawford* v. *Johnson*, 11 Ind., 258; *Borum* v. *Fouts*, 15 Ind., 50; *Newkirk* v. *Borson*, 21 Ind., 129; *Burrows* v. *Cook*, 17 Iowa, 436.

It must be admitted that these cases are in point and do sustain the position. But counsel could not have been aware of the fact that, so far as they do sustain his position, they have in later cases, by the same Courts, been expressly overruled. The Indiana statute came up for construction before the Supreme Court of the United States in *Hogg* v. *Raffner*, and it was held that by the peculiar terms of the statute the common law definition of usury was not enlarged, but that the intent was to include the common devices resorted to by usurers to evade its penalties.

Mr. Justice Grier, delivering the opinion of the Court, said:

" To constitute usury there must either be a loan and a [taking of usurious interest, or the taking of more than legal interest for the forbearance of a debt or sum of money due.    *    *    *
But it is manifest that if A propose to sell to B a tract of land for $10,000 in cash 'or $20,000 payable in ten annual installments, and if B prefers to pay the larger sum to gain time, the contract cannot be called usurious.    A vendor may prefer $100 in hand to double the sum in expectancy, and a purchaser may prefer the greater price with the longer credit; and one who will not distinguish between things that differ may say with apparent truth that B pays a hundred per cent. for forbearance, and may assert that such a contract is usurious; but whatever truth there may be in the premises, the conclusion is manifestly erroneous. Such a contract has none of the characteristics of usury.    It is not for the loan of money or forbearance of a debt." 1 Black., 118, 119.

He does, however, politely suggest a ground upon which *Crawford* v. *Johnson*, 11 Ind., may be distinguished.

The point subsequently came up for decision before the Supreme Court of Indiana, in *Newkirk* v. *Borson*, and Ray, Judge, delivering the opinion of the Court, quotes the above passage from the opinion of Mr. Justice Grier, and adds:

" If this position be correct, it cannot be of any importance at what times and in what amounts the payments upon a credit sale of land are made;

and it may not be clear even to those who can 'distinguish between things that differ' how the learned Judge could in that opinion endorse the case of *Crawford* v. *Johnson*, 11 Ind., 258, unless indeed it be assumed that in that case the sale of the land had been completed at a fixed price for cash, and that time was subsequently given, and illegal interest exacted for the forbearance. The same is true of the case of *Borum* v. *Fouts*, 15 Ind., 50, and except upon the assumption of a completed contract of sale for a fixed price, and a subsequent forbearance at an illegal rate of interest, these cases are not, in our opinion, consistent with the law as stated, we think accurately, in *Hogg* v. *Raffner*, *supra*." 28 Ind., 440.

In like manner the same point came before the Supreme Court of Iowa, subsequently to *Borrows* v. *Cook*, cited by counsel, and it was held that such contracts are not usurious, not being within the statute. The learned Judge who delivered the opinion of the Court, however, remarked:

"Of course if such contracts are resorted to as a cover for usury—to evade the usury laws—they will be held usurious. * * * For if the contract is in truth and fact a loan of money at usurious rates, it matters not what devices may be resorted to for the purpose of covering or concealing its true character, the law will strip from it these devices and adjudge it by what it is in fact rather than by what it may in its terms appear to be." *Gilmore* v. *Ferguson*, 28 Iowa, 223, 224.

If, then, as argued by counsel, and as we believe to be true, the statutes of Indiana and Iowa are substantially the same as the statute of Alabama the cases cited are strongly persuasive of the construction which we should place upon the latter, and the more so because of its simplicity and ease of application.

In the absence, then, of any authoritative decision by the Supreme Court of Alabama, this Court is content to hold that in Alabama, as in Indiana and Iowa, the loan of money or the forbearance of a debt actually due, at illegal rates of interest, is essential to constitute usury

In this view of the statute, the question presented is of easy solution. It is not pretended that Vasser desired to lend Gardner money at usurious rates, and resorted to the device of a sale of his plantation and negroes to accomplish his purpose, nor is it pretended that a *bona fide* sale was made for the consideration of $40,000, and that subsequently it was agreed to give credit at usurious rates of interest.

The Court is of opinion that there is no usury in the contract

And lastly, under the state of facts as disclosed by this record, the Court is of opinion that the defendant is not entitled to the benefit of the equitable set-off relied on. It is manifest that the negroes, having been mortgaged in Tennessee to a trustee residing there. to secure the debt due

Vasser, Gardner had no right to remove them beyond the jurisdiction of that State. In opposing the removal, and in stating the facts to the negroes, Vasser seems clearly not to have passed beyond the bounds of his rights. No ground is perceived upon which to predicate a conversion. The slaves returned with Gardner to the plantation, and remained for some time in his possesion and under his control. That they were lost sooner than otherwise they would have been is mere matter of speculation. Upon the whole it is impossible to resist the conclusion that if any loss accrued to Gardner in consequence of the acts of Vasser, as set out in the agreement copied into the record, it was *damnum absque injuria*, and furnishes no ground for equitable set off.

The decree of the Chancellor is affirmed, with costs.